UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROCKLANE COMPANY, LLC, | ) |
| *Plaintiff*, | ) ) ) |
| vs. | ) ) |
| TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA, | ) ) ) No. 1:17-cv-2158-JMS-DLP ) |
| *Defendant*. | ) ) ) |
| SYCAMORE VILLAGE HOMEOWNERS ASSOCIATION, INC., | ) ) ) ) |
| *Consol. Plaintiff*. | ) |

## ORDER

In this consolidated case, Plaintiffs Rocklane Company, LLC, ("Rocklane") and Sycamore Village Homeowners Association, Inc. ("the HOA") brought claims against Travelers Casualty Insurance Company of America ("Travelers") following a windstorm that allegedly damaged the roofs of buildings in the Sycamore Village condominium complex ("Sycamore Village"). Travelers filed a Motion for Summary Judgment as to the HOA's claim that Travelers breached its duty of good faith, [Filing No. 65], which the Court denied, [Filing No. 93]. This Order outlines the Court's reasoning for that denial.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear,

1

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Montgomery v. American Airlines Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717

2

(7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez,* 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co*., 400 F.3d 523, 526-27 (7th Cir. 2005).

Sycamore Village is a nineteen-building condominium complex located in Bloomington, Indiana. [Filing No. 1-2 at 4; Filing No. 74-9 at 54.] The HOA is responsible for maintaining and repairing the roofs, as well as purchasing and maintaining casualty insurance. [Filing No. 74-1 at 8; Filing No. 74-1 at 13.] To that end, the HOA purchased a casualty insurance policy from Travelers ("the Policy"). [Filing No. 1-2 at 3-183.] The Policy covers physical loss or damage to Sycamore Village, unless the loss was the result of a cause that was excluded from coverage, such as wear and tear or faulty or defective workmanship, repair, construction, or maintenance. [Filing No. 1-2 at 15-18; Filing No. 1-2 at 38-40.]

The roofs on the Sycamore Village buildings were installed between 2000 and 2002. [Filing No. 74-21 at 1.] Prior to February 2016, the HOA had intended to begin routine replacement of the roofs in 2022. [Filing No. 74-2 at 13-14.] The shingles used on the original Sycamore Village roofs were Elk Capstone shingles in the color Moss Rose, which were manufactured by a company called GAF but had been discontinued in 2012 and thus are no longer commercially available in significant quantities. [Filing No. 66-1 at 19; Filing No. 66-8 at 5; Filing No. 74-5 at 6-8.] No other shingles have been manufactured by GAF that would be an exact color match to the Elk Capstone Moss Rose shingles. [Filing No. 66-10 at 2; Filing No. 74-5 at 17.]

On February 19, 2016, there was a storm in Bloomington that brought high winds. [Filing No. 74-2 at 14-15.] Thereafter, residents of Sycamore Village noticed damage to the roofs, including missing and "misaligned" or sliding shingles. [Filing No. 74-2 at 17-19; Filing No. 74-7 at 1-2.] The HOA hired Rocklane to repair the roofs. [Filing No. 66-2 at 1.] Rocklane is a GAF Member Elite Contractor, meaning it qualifies as one of the best roofing contractors in the country and meets certain requirements imposed by GAF. [Filing No. 74-5 at 4-5; Filing No. 74-8 at 1-2.]

Rocklane went to Sycamore Village on March 9, 2016 to inspect the roofs and perform temporary repairs. [Filing No. 74-10 at 16.] Kevin Kortzendorf, a Rocklane employee, stated that he saw "massive amounts of shingle damage around the roofs" when he arrived at Sycamore Village, including "areas on every building . . . where shingles had been torn from their nails, sliding out, [and] sliding down." [Filing No. 74-10 at 17.] He and other Rocklane employees inspected all of the buildings in the Sycamore Village complex. [Filing No. 74-10 at 27.]

Rocklane performed temporary repairs by pushing dislodged shingles back into place and securing them with cap nails.[1] [Filing No. 74-10 at 13.] The temporary cap nail repair cost $100 per building for a total of $1900. [Filing No. 74-10 at 11; Filing No. 74-10 at 32.] Randal Adkins, one of Rocklane's owners, averred that regardless of whether temporary repairs at Sycamore Village were completed using cap nails or using tarps secured with lengths of wood nailed to the roof, undamaged shingles would have been damaged in the course of the repair because both methods require driving nails through undamaged shingles adjacent to damaged areas. [Filing No. 74-8 at 3.] He opined that a temporary repair with the tarp method would have been more expensive and caused more damage than the cap nail method. [Filing No. 74-8 at 3.]

The HOA reported the roof damage to Travelers on April 5, 2016. [Filing No. 66-4 at 1.] Travelers assigned Kristen Kulikowski[2] as the adjuster on the claim. [Filing No. 66-6 at 2.] The HOA hired a public adjuster, Matthew Latham from Crossroad Claim Consulting, to represent it concerning the wind damage claim. [Filing No. 66-3 at 1-2.]

At Travelers's request, Roofing Consultants Limited ("RCL") inspected the Sycamore Village roofs on May 31, 2016 and prepared a report. [Filing No. 66-5 at 1.] RCL noted that shingles had been improperly installed and many nails were under-driven, overdriven, or haphazardly placed, leaving the roofs susceptible to wind damage. [Filing No. 66-5 at 3.] RCL concluded that the roofs exhibited "varying relatively minimal degrees of damage potentially exacerbated by wind," with only two shingles completely missing from building #2 and nine shingles missing from building #8. [Filing No. 66-5 at 4-5.] The report contained a table which

---

[1] A cap nail is a nail with a plastic cap that is larger than an ordinary nail head and is generally used in tarping and temporary repairs. [Filing No. 74-5 at 15.]

[2] Ms. Kulikowski has since changed her name to Kristen Morrison. [Filing No. 66-6 at 1.] However, because Kristen Kulikowski is the name that appears on many of the documents submitted by the parties, the Court will use that name in this Order.

indicated that there were 548 cap nailed shingles that had been lifted but were in place and 11 missing shingles. [[Filing No. 66-5 at 8](#).] RCL determined that this damage was "minimal and certainly repairable," that the roofs could be returned to pre-storm condition with isolated repair work, and that full replacement of each of the roofs was not warranted. [[Filing No. 66-5 at 5](#).] RCL opined that the shingle damage was not the result of a wind event, stating that the aged sealant and inconsistent numbers of shingles damaged on the leeward side of the building were indications that the shingles that had been lifted over the nails but remained in place were in a condition that had "accumulated over a long period of time." [[Filing No. 66-5 at 5](#).] RCL noted that metal flashings, gutters, and other "roof accessory items" had not been lifted, dislodged, or damaged in a way that would be consistent with strong winds, and "poor attachment methods" were likely "the primary catalyst for the damage that occurred." [[Filing No. 66-5 at 5](#).] Finally, RCL opined that the number of shingles that were face nailed as a temporary repair was excessive and unnecessary, and that cap nailing caused significant damage that "definitely outweigh[ed] any storm damage" and would require replacement of the nailed shingles. [[Filing No. 66-5 at 5](#).] Ms. Kulikowski sent RCL's report to Mr. Latham on July 14, 2016. [[Filing No. 66-6 at 2](#).]

In response, Mr. Latham sent a letter to Travelers disagreeing with RCL's observations and conclusions. [[Filing No. 74-21](#).] In the letter, Mr. Latham called RCL's report "slanderous, irresponsible, and . . . the result of an improper investigation." [[Filing No. 74-21 at 2](#).] Mr. Latham defended Rocklane's temporary repair on the grounds that the damaged shingles that were later cap nailed could not have been reused anyway according to the Indiana Building Code and would have needed to be replaced regardless, and cap nailing was more cost-effective than using tarps. [[Filing No. 74-21 at 2](#).] Mr. Latham maintained that RCL's investigation was flawed and was not designed to discover latent damage to the roofs caused by wind. [[Filing No. 74-21 at 3](#).]

6

The HOA then hired Timothy Lee of T. Lee Engineering, Inc. to inspect the Sycamore Village property on July 28, 2016. [[Filing No. 66-10](#).] Mr. Lee concluded that the shingles at Sycamore Village sustained "widespread structural damages as a result of the forces associated with high winds." [[Filing No. 66-10 at 1](#).] Due to this damage, he opined, the shingles were in poor condition, required full replacement, and were "not repairable or replaceable on an individual basis." [[Filing No. 66-10 at 1-2](#).] Specifically, because the shingles were rigid and not flexible, manipulation necessary for repairs would cause damage to the shingles, including "fastener pull through." [[Filing No. 66-10 at 2](#).] Mr. Lee further stated that the number of nails utilized during the temporary repairs of the roofs was consistent with the number of nails that would have been used if temporary repairs had been done with tarps. [[Filing No. 66-10 at 2](#).] Mr. Lee noted that removed or damaged shingles like the ones observed at Sycamore Village could not be reinstalled under the Indiana Building Code. [[Filing No. 66-10 at 3-4](#).]

Travelers then hired Halliwell Engineering Associates ("Halliwell") to perform another inspection of Sycamore Village. [[Filing No. 66-6 at 2](#).] Halliwell inspected Sycamore Village on August 18, 2016. [[Filing No. 66-8 at 1](#).] Present at that inspection were Ms. Kulikowski, Mr. Latham, a construction consultant hired by Travelers, and two Halliwell engineers. [[Filing No. 66-8 at 3](#).] In its report, Halliwell noted that no exterior damage, such as to gutters, vinyl siding, windows, or doors, was observed. [[Filing No. 66-8 at 4](#).] Halliwell opined that the cap nailing by Rocklane caused more damage to the roof than was created "by other forces or specific events," and recommended repairing the roofs by using an approved sealant to re-attach any loosened shingles and seal the holes created by the cap nails. [[Filing No. 66-8 at 9](#).] Halliwell also opined that the shingles "may have been installed using an over-pressurized air nailing device" or attached with staples that had corroded. [[Filing No. 66-8 at 9](#).] The report stated that the type of damage

7

observed near the shingle fasteners was "in contrast to that typically created by wind uplift forces." [Filing No. 66-8 at 10.] Halliwell opined that the windstorm caused damage to two small areas of Sycamore Village, which could be repaired without replacing the entire roof on each of the buildings. [Filing No. 66-8 at 10]

Travelers sent a letter to the HOA on October 5, 2016, concerning its claim decision. [Filing No. 66-11.] The letter acknowledged that Sycamore Village had sustained wind damage but, based on the reports from Halliwell and RCL, concluded that the wind damage was repairable. [Filing No. 66-11 at 3.] The letter also noted that the Policy did not cover faulty, inadequate, or defective workmanship, and, therefore, the damage caused by Rocklane's cap nailing the shingles was not covered. [Filing No. 66-11 at 3.] Travelers's estimate included $1,900 to cover the cost of Rocklane's temporary repairs, stating that although the repairs were not done correctly, they constituted an attempt to mitigate the damage, which the Policy covered. [Filing No. 66-11 at 3.] The total amount that Travelers paid to the HOA was $10,753.14. [Filing No. 66-12 at 1.]

When asked about the claim decision, Ms. Kulikowski stated that she believed that covered wind damage had occurred, but she disagreed with the HOA as to the cost of repairing that damage. [Filing No. 84-1 at 11-12.] The claim payment amount, she stated, was based on a repair that would include re-securing shingles that had become displaced and slid down the roof. [Filing No. 84-1 at 13.] As to the issue of whether such repair violated the Indiana Building Code, Ms. Kulikowski did not believe that the Code applied. [Filing No. 84-1 at 17-19.] She sent an email to an official with the Monroe County Building Commission, Jim Gerstbauer, memorializing her perception of a telephone conversation she had with him. [Filing No. 84-1 at 73.] In that email, she stated that she had asked whether the Code prohibited the repair or reattachment of shingles that were lifted above their fasteners or were loosened from their fasteners, and whether the Code

8

prohibited the repair or reattachment of shingles that exhibited broken seals. [Filing No. 84-1 at 73.]

She included the following paragraph:

> You advised that, based on information that you were provided, the scenarios presented would not be in violation of the code that prohibits the re-use of the shingles and repair could be considered. Regarding the fasteners, you would find it reasonable to re-fasten the shingles provided there was room to install new fasteners next to where the original fasteners were loose or lifted. In general, you advised that the issue explained to you did not appear to be [a] code issue that would not allow the re-use of shingles, repair procedures should be addressed through the manufacturer.

[Filing No. 84-1 at 73.] In response, Mr. Gerstbauer crossed out the above-quoted paragraph in its entirety. [Filing No. 84-1 at 73.] He added that it may be possible to repair a roof system that had been compromised, but the Code offered no specific guidelines. [Filing No. 84-1 at 73.] Mr. Gerstbauer also wrote that Monroe County and the City of Bloomington "would support any solutions or repair instructions supported by the shingle manufacturer." [Filing No. 84-1 at 73.] He concluded that the email, incorporating his changes striking out the above paragraph, accurately summarized his conversation with Ms. Kulikowski. [Filing No. 84-1 at 73.]

Ms. Kulikowski acknowledged that she was aware of GAF's manufacturer bulletin concerning storm damaged shingles, as one of her consultants had attached the document to its report. [Filing No. 84-1 at 26-27.] That document said:

> While individual damaged shingles on a roof can be replaced, it generally is not recommended if there are more than 2 or 3 damaged shingles on a roof or a plane (section) of the roof . . . . For long term performance as well as aesthetic reasons, complete replacement is recommended for roofs that have a significant number of shingles that need to be replaced due to storm damage.

[Filing No. 84-1 at 74.] Ms. Kulikowski stated that she based her repair estimate on her consultant's opinions without explicitly considering whether the estimated repairs were approved

9

by the manufacturer, but instead assumed that the consultants had considered that issue. [Filing No. 84-1 at 27-28.]

According to Ms. Kulikowski, Travelers's construction consultant who was present during Halliwell's inspection of Sycamore Village stated that, if his company were doing the repair work, he would not warranty Halliwell's suggested repairs of resealing displaced shingles, but would warranty shingle replacement only. [Filing No. 84-1 at 32.] Ms. Kulikowski stated that she learned from Halliwell in 2016 that the shingles on the Sycamore Village roofs were discontinued and that less than 559 shingles would be available to do a repair. [Filing No. 84-1 at 47-48.]

On December 14, 2016, Mr. Latham sent a letter to Ms. Kulikowski asserting that the loss estimate was erroneous. [Filing No. 66-13.] Specifically, Mr. Latham stated that RCL and Halliwell did not perform proper inspections to detect the latent damage to the roofs caused by the windstorm. [Filing No. 66-13 at 2.] Mr. Latham stated that Mr. Adkins had expressed to Ms. Kulikowski that, in hindsight, he wished he had removed all of the damaged shingles and then covered the roof with an ice and water shield. [Filing No 66-13 at 7.] Ms. Kulikowski allegedly responded that such course of action would have made her job a lot easier, but she would not hold it against the HOA. [Filing No. 66-13 at 7.] Mr. Latham asserted in the letter that this statement was an admission of damage that was inconsistent with Travelers's ultimate estimate. [Filing No. 66-13 at 7.]

Ms. Kulikowski does not recall making a statement indicating that her job would have been easier if Rocklane had removed all of the damaged shingles and placed tarps on the roofs. [Filing No. 84-1 at 53.] She testified that she never would have made such a statement because that method would not have allowed her to see the damage, whereas the cap nail method allowed her to see where the damage was. [Filing No. 84-1 at 53.] In her affidavit, Ms. Kulikowski averred

that she does not remember making the statement, but if she did, she would have meant that if she were able to see the roofs in the condition that they were in after the windstorm, she may have seen the damage that the HOA claims to have sustained. [Filing No. 66-6 at 2.]

The HOA assigned its insurance claim concerning the February 2016 windstorm damage to Rocklane on March 30, 2017. [Filing No. 66-16.]

On April 18, 2017, a tree fell onto the roof of one of the Sycamore Village buildings, causing damage. [Filing No. 74-10 at 28-29; Filing No. 74-18 at 1.] The HOA submitted a claim to Travelers. [Filing No. 74-18 at 1.] Travelers agreed to pay for the building's whole roof to be replaced. [Filing No. 74-18; Filing No. 74-19.] Ms. Kulikowski was not the adjuster on Sycamore Village's 2017 roof damage claim. [Filing No. 74-19; Filing No. 84-1 at 49.]

The HOA filed a complaint in state court, asserting that Travelers breached its duty of good faith with respect to the February 2016 wind damage claim by making an unfounded refusal to pay for full replacement of the Sycamore Village roofs, causing an unfounded delay in making payment, and deceiving its insured. [Filing No. 32-1.] Travelers removed the action to federal court, and, upon motion of the parties, the HOA's action was consolidated with Rocklane's lawsuit against Travelers alleging a breach of the Policy. [Filing No. 32; Filing No. 33.]

### III.
#### DISCUSSION

Travelers argues that it is entitled to summary judgment against the HOA because there is no evidence that Travelers acted in bad faith in issuing its coverage decision relating to the February 2016 storm. [Filing No. 67 at 8-11.] Rather, it argues, the undisputed facts show that its thorough investigation and reports from two independent engineering firms gave it a rational, principled basis for its decision, regardless of whether such decision ultimately was correct. [Filing No. 67 at 9-10.] Travelers also asserts that Ms. Kulikowski's alleged statement—that her

11

job would have been easier if Rocklane had not cap nailed the shingles, but she would not hold that against the HOA—was not deceptive because it was true. [Filing No. 67 at 10-11.]

The HOA responds that a genuine issue of material fact remains as to whether Travelers acted in good faith and a reasonable jury could conclude that Travelers knew that its claim decision was unfounded. [Filing No. 76 at 13-17.] Specifically, the HOA argues that anything less than replacing damaged shingles was prohibited by the Indiana Building Code, and because the specific shingles needed had been discontinued and existing caselaw mandated that the loss payment provision of the Policy be construed to cover the cost of repairing the buildings in a way that resulted in a uniform appearance, Travelers was required to replace the whole roof on each building. [Filing No. 76 at 13-14.] Accordingly, it asserts, a reasonable juror could conclude that Travelers decision to pay only for isolated repairs was in bad faith. [Filing No. 76 at 14.] The HOA points to the following specific facts: (1) the email exchange between Ms. Kulikowski and Mr. Gerstbauer, which shows that Travelers was aware that its proposed repair violated the Code; (2) the construction consultant told Ms. Kulikowski that he would not warranty repairs like the ones suggested; (3) the claim evaluation estimates reduced the number of damaged shingles from 559 to 11 after it was discovered that replacement shingles were not available in large quantities; (4) the payment to cover Rocklane's temporary repairs while maintaining that such repairs were unreasonable; (5) the 2017 claim, which had a different adjuster, acknowledged the requirement for uniformity and resulted in a full roof replacement; (6) the lack of evidence demonstrating that Travelers made an effort to comply with the Building Code or the manufacturer's recommendations concerning the repair of storm-damaged shingles. [Filing No. 76 at 14-16.]

In reply, Travelers asserts that the HOA did not present any evidence to challenge its engineers' conclusions that the damage to the roofs was caused by faulty workmanship rather than

12

wind. [Filing No. 81 at 2-5.] Travelers disputes that it had any obligation to replace entire roofs for aesthetic reasons, asserts that it never made inconsistent statements concerning whether Policy exclusions applied or whether Rocklane's temporary repairs were correctly performed, and argues that the evidence does not support the HOA's assertion that its proposed repairs included reusing cap nailed shingles and sealing their holes. [Filing No. 81 at 2-3.] Travelers further argues that, because nothing in the HOA's brief questions the findings of its two engineers, their "unchallenged" reports demonstrate that the HOA cannot meet its burden to show that Travelers denied the claim in bad faith, and the decision not to pay the full amount demanded on the claim "cannot be characterized as anything other than reasonable." [Filing No. 81 at 3-5.]

Indiana law recognizes a cause of action for an insurer's breach of its duty to deal with its insured in good faith. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993). This duty of good faith includes, but is not limited to, the obligation to "refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." *Id.*; *see also Monroe Guar. Ins. Co. v. Magwerks Corp.,* 829 N.E.2d 968, 976 (Ind. 2005) ("[A]n insurer's duty to deal in good faith with its insured encompasses more than a bad faith coverage claim."). The duty is not breached merely because an insurer denies a claim, even if it is later determined that the insurer breached the contract. *Erie*, 622 N.E.2d at 520. The duty is also not breached by a lack of diligent investigation. *Id.* Conversely, the duty is breached when the insurer "denies liability knowing that there is no rational, principled basis for doing so." *Id.*

A finding of bad faith "requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Monroe*, 829 N.E.2d at 977 (internal quotations and citation omitted). Intent is a factual issue that can be proved by circumstantial evidence.

13

*v. State Farm Mut. Auto. Ins. Co.*, 712 N.E.2d 38, 41 (Ind. Ct. App. 1999) ("[A] final determination of the significance of all of the evidence presented by [the insured] is a question for the jury.").

As a preliminary matter, although it is possible for an insurer to erroneously deny or limit a claim without breaching its duty of good faith, the inverse is not true. In other words, in order for the HOA to prevail on its claim that Travelers breached its duty of good faith by issuing a claim decision that it knew was irrational or unfounded, the HOA would need to establish both that Travelers's limiting of the claim was a breach of the Policy, and that Travelers had the requisite knowledge and intent. *See Erie*, 622 N.E.2d at 520; *Monroe*, 829 N.E.2d at 977. Genuine issues of material fact as to both of those elements prevent the court from entering summary judgment in favor of Travelers on the HOA's claim.

Notably, Travelers did not move for summary judgment as to Rocklane's breach of contract claim, presumably because disposition of that claim depends on the resolution of factual issues that are disputed by the parties, including whether the alleged roof damage was caused by a windstorm or improper installation and whether the cap nail repair was unreasonable. Conflicting evidence concerning these matters—such as the various opinions from the different engineers—means that a reasonable jury could find in favor of either party on the issue of whether the claim decision was contrary to the Policy.

The same is true as to the element of Travelers's intent. Travelers relies heavily on the fact that its claim decision appears to have been supported by the reports of RCL and Halliwell. However, those reports were not undisputed, as Mr. Lee's report reached the opposite conclusion, Mr. Latham's letter highlights several specific concerns that the HOA had regarding RCL's and Halliwell's methodologies and conclusions, and Rocklane employees believed that the cap nail repair was more reasonable than any other method of repair. The fact that Travelers relied on two

14

engineers' reports does not demonstrate that such reliance was in good faith, so the existence of those reports is not dispositive.

Instead, a finding of bad faith (or lack thereof) will depend on a jury's evaluation of all of the relevant facts and circumstances. See *Gooch*, 712 N.E.2d at 41. For the HOA to survive summary judgment, however, it is sufficient that there are facts in the record from which a reasonable jury could make a finding of bad faith. For example, a reasonable jury could conclude that Ms. Kulikowski did make the alleged statement that she wished Rocklane had not cap nailed the shingles and could then conclude that the cap nailing influenced her claim decision and that her later denial of the claim was inconsistent with her representation that she would not hold anything against the HOA. In addition, given the email exchange with Mr. Gerstbauer, the construction consultant's statement that he would not warranty Halliwell's suggested repairs, and Ms. Kulikowski's acknowledgement of the manufacturer bulletin concerning storm-damaged shingles, a reasonable jury could conclude that Travelers knew that its payment would cover only inadequate repairs that were at odds with the Indiana Building Code or the manufacturer's specifications. Third, the fact that the type of shingles used on the Sycamore Village roofs were no longer commercially available in large quantities could support a reasonable inference that Travelers was attempting to minimize the scope of the damage in order to avoid having to pay to fully replace the damaged roofs. Finally, the fact that Travelers, through a different adjuster, agreed to pay for the replacement of an entire roof in a subsequent claim could support an inference of bad faith.

It will be the job of the jury to determine whether the above facts are true and whether they collectively demonstrate that Travelers breached its duty of good faith. However, because the disposition of this claim depends on an unresolved factual question of intent, and Travelers has

failed to demonstrate that no reasonable jury could find in the HOA's favor, summary judgment on the HOA's bad faith claim is inappropriate. *See* Fed. R. Civ. P. 56(a); *Nelson*, 570 F.3d at 875.

## IV.
### CONCLUSION

It is for the foregoing reasons that the Court previously denied Travelers's Motion for Summary Judgment, [Filing No. 65].

Date: 1/13/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**